**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARCUS CREIGHTON, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.  15-cv-04121 |
| v. | Judge |
| METLIFE, INC., METLIFE SECURITIES, INC., and METROPOLITAN LIFE INSURANCE COMPANY, | Jury Trial Requested |
| Defendants. | |

## COMPLAINT

Plaintiff Marcus Creighton, individually and on behalf of all others similarly situated, by and through his attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants MetLife, Inc., MetLife Securities, Inc., and Metropolitan Life Insurance Company (collectively "Defendants," "MetLife," or "the Firm") and in support states as follows:

## JURISDICTION AND VENUE

1.      Plaintiff's claims arise under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.[1]

2.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b).  Defendants are licensed to and perform business in this District and service clients who are residents of this District.  The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

---

[1] Plaintiff has filed a representative charge of discrimination with the Equal Employment Opportunity Commission but has not received a notice of right to sue.  Plaintiff intends to amend his complaint to add individual and class claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended, after he has exhausted his administrative remedies.

## PARTIES

3.      Defendant MetLife, Inc. is among the largest global providers of insurance, annuities, and employee benefit programs in the United States.  MetLife, Inc. provides financial advisory and brokerage services through its subsidiaries, MetLife Securities, Inc. and Metropolitan Life Insurance Company.  Defendants employ registered brokers, called Financial Services Representatives ("FSRs"), in dozens of locations across the United States to sell MetLife benefit products, provide brokerage and wealth management services, and serve as the face of MetLife to individual and institutional clients.  In 2014, MetLife achieved revenues of approximately $73.3 billion and a net income of nearly $6.2 billion, and maintained shareholders' equity of nearly $72 billion.

4.      Defendant MetLife Securities, Inc. is a wholly-owned subsidiary of MetLife, Inc. MetLife Securities, Inc. is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and is licensed in all 50 states.  Defendant Metropolitan Life Insurance Company is a wholly-owned subsidiary of MetLife, Inc.[2]

5.      Plaintiff Marcus Creighton is African American and was employed by MetLife as an FSR for the region that includes Illinois from 2001 until October 2014.  Plaintiff had direct responsibility for Defendants' clients in seven states, including Illinois, and met regularly with clients and potential clients in this District.

---

[2] MetLife Securities, Inc. and Metropolitan Life Insurance Company are under common control and have entered into a service agreement under which Metropolitan Life Insurance Company provides various personnel, systems, and facilities to MetLife Securities Inc. to facilitate MetLife Securities, Inc.'s business operations.  Plaintiff names both in an abundance of caution as both were registered and have played a role in his employment.

## FACTUAL ALLEGATIONS

6.      Defendants maintain a racially biased corporate culture and stereotypical views about the skills, abilities, and potential of African Americans that infect personnel decisions and form the basis of the policies and practices challenged by this lawsuit.

7.      Defendants maintain centralized control over their wealth management business, and a nearly all-white team of senior executives issues mandatory company policies that apply to the FSR workforce.  These include uniform, Firm-wide policies and practices that govern FSR training; FSR compensation; FSR team formation and pool relationships; the transfer and distribution of leads and accounts to FSRs, including "orphaned" client accounts (accounts previously serviced by FSRs who have left the Firm but that have not been reassigned to a new FSR); and the referral of business opportunities via programs such as "PlanSmart" and "Delivering the Promise."

8.      Defendants maintain uniform, company-wide teaming, account transfer and distribution, and referral policies and practices that result in a segregated workforce and significant racial disparities in compensation and attrition.  These policies and practices also have a disparate impact on African Americans.

9.      Under Defendants' teaming policies and practices, FSRs are permitted to form teams with other FSRs and combine their client accounts and books of business.  Defendants confer special policy advantages, resources, and benefits to FSRs on teams.  For example, team members receive credit for client accounts and production credits generated by the team, and steer client assets and business opportunities to FSR trainees on teams who otherwise would not receive these assets and opportunities.  African American FSRs are almost entirely excluded from favorable teaming and pool relationships.

10.     Defendants' account transfer and lead distribution policies and practices disproportionately steer lucrative business opportunities to FSRs who are not African American. Likewise, "orphaned" accounts are routinely steered disproportionately to non-African American FSRs.

11.     Further, Defendants allow certain FSRs to be designated as "Delivering the Promise" specialists.  Under this designation, FSRs are granted exclusive access to individual and family beneficiaries of insurance policies served by MetLife.  These "Delivering the Promise" specialists are given additional training to assist insurance beneficiaries in their time of need, and the specialists then gain exclusive access to promote MetLife financial advisory services and retain the beneficiaries as clients.  The "Delivering the Promise" specialist and referral program harms and has a disparate impact on African Americans by excluding them from opportunities to gain access to lucrative client accounts.

12.     In sum, Defendants subjected Plaintiff and all others similarly situated to an ongoing nationwide pattern and practice of race discrimination and employed company-wide policies and practices that had a disparate impact on African Americans.  Defendants' systemic discrimination against African Americans includes, but is not limited to, the following practices:

   a)  Employing firm-wide teaming and pooling policies and practices that disproportionately exclude African Americans from participation in favorable teams and pools, which results in a segregated workforce and substantial racial disparities in earnings and attrition;

   b)  Employing firm-wide account transfer and lead referral policies and practices that disproportionately steer lucrative client accounts and other business opportunities to FSRs who are not African American;

   c)  Employing firm-wide training policies and practices that discriminate against African Americans and rely on factors that disproportionately harm African American FSRs;

   d)  Employing firm-wide management assessment and assignment policies and practices that harm African Americans and segregate the workforce; and

4

e) Employing firm-wide compensation policies and practices that disadvantage African Americans.

13.     The practices described above are ongoing and constitute a continuing violation of the civil rights laws.

14.     The racially discriminatory policies and practices at MetLife are uniform and national in scope.  Class members are relying on Plaintiff and this lawsuit to protect their rights.

**Plaintiff Was Subjected To And Harmed By Defendants' Unlawful Conduct**

15.     Plaintiff worked as a MetLife FSR from 2001 until he was unlawfully terminated in the fall of 2014.  During much of his tenure at the Firm, Plaintiff was the only African American FSR in his region, which encompassed seven states: Illinois, Iowa, Arkansas, Missouri, Kansas, Nebraska, and parts of Oklahoma.

16.     Plaintiff, like other African American FSRs, was subjected to race discrimination and retaliation while employed as a MetLife FSR.  Consistent with Defendants' discriminatory policies and practices, Plaintiff was denied valuable client leads, referrals, account transfers and distributions.  Similarly, Plaintiff was also denied membership in and the benefits of favorable team relationships and specialist designations (including the "PlanSmart" or "Delivering the Promise" specialist certification) due to his race.

17.     Despite his differential treatment, Plaintiff was successful in developing substantial business for MetLife.  For example, during 2014, Plaintiff secured a large nonprofit health care organization and the largest employer in the state of Missouri as a MetLife client. Based on Plaintiff's efforts, the client agreed to utilize MetLife's lucrative, pre-paid legal benefit plan and "PlanSmart" financial literacy program.  The legal benefit plan was expected to generate $750,000 in revenue to MetLife in its first year alone, and the PlanSmart program was potentially more lucrative, as it allowed MetLife to market its investment and retirement

platforms to the client's entire employee base.  Collectively, these opportunities were projected to generate millions of dollars in commissions annually and should have established Plaintiff as one of the top FSRs in the region.

18.     Plaintiff sought to form pools and teams with other FSRs to assist with the large amount of business he had brought to the Firm.  Defendants, however, refused to allow Plaintiff to team or pool with other FSRs and failed to otherwise support Plaintiff in developing this business.  Indeed, Defendants refused to allow Plaintiff to service his client's employees or to share in the revenues generated from his client's business.  Defendants instead directed the more lucrative investment portion of his client's business to white FSRs and denied Plaintiff the benefit of the business he brought to the Firm.  Defendants also refused to provide Plaintiff with the PlanSmart training and certification it promised if he successfully acquired the client's business.  However, under nearly identical circumstances, the Firm provided a white FSR with PlanSmart training and certification after the white FSR acquired a sizeable client and allowed the white FSR to benefit financially from the investment business he brought to the Firm.

19.     Plaintiff's complaints about his differential treatment and appeals to management were flatly rejected.  In retaliation for his complaints, Plaintiff was threatened with termination. Faced with an imminent and unwarranted termination and an unbearably hostile work environment, Creighton had no choice but to submit his resignation from MetLife in October of 2014 in order to salvage his career from a reported termination on his Financial Industry Regulatory Authority ("FINRA") Form U5 Uniform Termination Notice.

20.     MeLife also denied Plaintiff advancement opportunities, although he was a successful, experienced FSR and well-qualified to join management.  Plaintiff was denied management opportunities as a result of Defendants' discriminatory management assessments,

6

training, and selection practices, which systematically and disproportionately exclude African Americans from branch management and most management-feeder positions. Similarly situated non-African Americans, including those who never expressed interest in management, were selected for management opportunities, management training, management feeder positions, and were assigned to manage Defendants' branch offices.

21.     As a result of Defendants' unlawful conduct, Plaintiff lost wages and other benefits, and suffered irreparable harm to his career, emotional distress, and other nonpecuniary losses. Defendants' actions have caused and continue to cause Plaintiff substantial losses in earnings, management opportunities, and other employment benefits, in an amount to be determined by a jury.

## CLASS ALLEGATIONS

22.     Plaintiff files this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who worked for Defendants as FSRs and who were subjected to discrimination by Defendants due to their race. All requirements of class certification are met by the proposed class.

23.     The class of African American employees and former employees is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

24.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

25.     The claims alleged by Plaintiff are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

26. Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

27. The proposed class meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

28. Alternatively, the issues of determining liability and equitable relief are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF
### 42 U.S.C. § 1981

29. Plaintiff, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

30. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

31. Defendants maintained a nationwide set of uniform, discriminatory employment practices and engaged in a pattern or practice of systemic race discrimination against African Americans which constitute illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

32.     Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT II

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981

33.     Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

34.     Plaintiff engaged in protected activity and suffered retaliation by Defendants in violation of 42 U.S.C. § 1981.

35.     Plaintiff suffered harm as a result of Defendants' unlawful retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and all others similarly situated, respectfully request that this Court find against Defendants as follows:

a.     Certify this case as a class action;

b.     Designate Plaintiff as Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c.     Declare that Defendants' acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981;

d.     Declare that Defendants engaged in a pattern and practice of racial discrimination against African Americans and employed policies and practices that have an unlawful disparate impact on African Americans;

e.     Declare that Defendants engaged in unlawful race discrimination and retaliation against Plaintiff, and order all appropriate relief;

f.      Order Plaintiff and all others similarly situated reinstated to their appropriate positions, promotions and seniority, and otherwise make Plaintiff and all others similarly situated whole;

g.      Award Plaintiff and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct;

h.      Award Plaintiff and all others similarly situated compensatory and punitive damages;

i.      Award Plaintiff and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

j.      Award Plaintiff and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff and others similarly situated; and

k.      Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiff and those
similarly situated,

_s/ Linda D. Friedman_____

STOWELL & FRIEDMAN LTD.

Linda D. Friedman – Attorney No. 06190092
Suzanne E. Bish – Attorney No. 06242534
George S. Robot
STOWELL & FRIEDMAN LTD.
303 W. Madison
Suite 2600
Chicago, Illinois  60606
(312) 431-0888